NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13382


MATTHEW SUTTON[1]  vs.  JORDAN'S FURNITURE, INC.



Middlesex.     October 4, 2023. - March 28, 2024.

Present:  Budd, C.J., Gaziano, Lowy, Kafker, Wendlandt,
& Georges, JJ.[2]


Massachusetts Wage Act.  Labor, Wages, Overtime compensation,
     Minimum wage.  Minimum Wage.  Practice, Civil, Class
     action, Summary judgment, Attorney's fees, Costs,
     Retroactivity of judicial holding.  Statute, Construction.
     Administrative Law, Agency's interpretation of statute.
     Retroactivity of Judicial Holding.  Damages, Attorney's
     fees.



     Civil action commenced in the Superior Court Department on
June 19, 2019.

     The case was heard by Camille F. Sarrouf, Jr., J., on
motions for summary judgment; a motion to amend the judgment and
for attorney's fees and costs was also heard by her; and a
second amended judgment was entered by her.

     The Supreme Judicial Court granted an application for
direct appellate review.

_____

     [1] Individually and on behalf of all others similarly
situated.

     [2] Justice Lowy participated in the deliberation on this case
prior to his retirement.

Brant Casavant (Hillary Schwab also present) for the plaintiff.

Julie B. Brennan (Ariel D. Cudkowicz & Dawn Reddy Solowey also present) for the defendant.

Joshua D. Nadreau, for Retailers Association of Massachusetts, was present but did not argue.

The following submitted briefs for amici curiae:

Michael J. Sheehan, P. Kevin Connelly, & Barrick Bollman, of Illinois, Robert J. Cordy, Andrew Liazos, Frank J. Bailey, & Selena Fitanides for Pioneer Public Interest Law Center.

Raven Moeslinger for Massachusetts Employment Lawyers Association & others.

Andrea Joy Campbell, Attorney General, & Alexander Sugerman-Brozan, Assistant Attorney General, for the Attorney General.

GEORGES, J. The primary issue in this case is whether the commissions-based compensation scheme for sales employees of a retail employer, Jordan's Furniture, Inc. (Jordan's), complied with the overtime statute, G. L. c. 151, § 1A, and the Sunday pay statute, G. L. c. 136, § 6 (50).[3] We held in Sullivan v. Sleepy's LLC, 482 Mass. 227, 228 (2019) (Sleepy's), that (1) employers must make "separate and additional payments" to one hundred percent commission sales employees, to compensate the employees "for every hour [they] worked over forty hours or on Sunday"; and (2) "draws and commissions cannot be retroactively allocated" to meet these requirements "even if

---

[3] Portions of the record and the parties' briefs were impounded pursuant to a Superior Court order. The impoundment is "lifted as to the information in the opinion, to the extent necessary in resolving the case." Commonwealth v. Stevenson, 474 Mass. 372, 373 n.1 (2016).

th[o]se draws and commissions equaled or exceeded the minimum wage for the employees' first forty hours of work and one and one-half times the minimum wage for all hours worked over forty hours or on Sunday."

This class action lawsuit was brought in the Superior Court by a former Jordan's employee on behalf of all persons employed at one of Jordan's Massachusetts stores as sales employees between 2016 and 2019 and who worked more than forty hours in any work week or on any Sunday.  The plaintiff class alleged that Jordan's failed to comply with the requirements this court outlined in Sleepy's.  See Sleepy's, 482 Mass. at 228-229.  On cross motions for summary judgment, the motion judge agreed and granted summary judgment in favor of the plaintiff class because Jordan's compensation plan "failed to remit separate and additional payments to its sales [employees] for overtime and Sundays," thereby violating the overtime and Sunday pay statutes.  Subsequently, after the plaintiff class sought statutory attorney's fees and costs as the prevailing party, the same judge utilized the lodestar method to calculate the award of attorney's fees, discounted hours spent in settlement negotiations, and enhanced the lodestar figure by using a four times multiplier.[4]

---

[4] The lodestar method is a means of calculating attorney's fees that involves "multiplying the number of hours reasonably

Jordan's now appeals, maintaining that its compensation scheme complied with the overtime and Sunday pay statutes, that the judge erred in applying our decision in Sleepy's retroactively, and that there is no private right of action for violations of the Sunday pay statute.[5]  Both parties also appeal from aspects of the judge's calculation of attorney's fees.

We conclude, as the motion judge did, that Jordan's compensation scheme violated G. L. c. 151, § 1A, and G. L. c. 136, § 6 (50).  Further, the judge did not err in applying our holding in Sleepy's to this case.  We also conclude that the Sunday pay statute is enforceable under the Wage Act's private right of action, G. L. c. 149, § 150.

Regarding attorney's fees, we hold that the judge abused his discretion by relying exclusively on common fund cases to support the application of a four times lodestar multiplier and by categorically deducting time spent toward settlement negotiations.

Accordingly, while we affirm the order on summary judgment, we vacate so much of the second amended judgment as awards attorney's fees to the plaintiff class, and remand this matter

spent on the case times a reasonable hourly rate."  Fontaine v. Ebtec Corp., 415 Mass. 309, 324 (1993).

[5] Jordan's does not argue that there is no private right of action to enforce the overtime statute.

to the Superior Court for recalculation of the award of attorney's fees consistent with this opinion.[6]

1. Background. a. Facts. Jordan's is a Massachusetts corporation that owns and operates retail furniture stores in Massachusetts and other States. Matthew Sutton, the named plaintiff, is a former Jordan's sales employee. He represents a class of employees who worked at Jordan's Massachusetts stores as "sale consultant[s]" or "sleep technician[s]" between June 19, 2016, and August 1, 2019, and worked more than forty hours in any work week or on any Sunday. Jordan's sales employees work at its retail stores and sell furniture and related products to customers. As part of their regular work schedules, Jordan's sales employees often work on Sundays. Some of Jordan's sales employees occasionally work more than forty hours per week. All members of the plaintiff class worked either on a Sunday or over forty hours in at least one week between 2016 and 2019.

Jordan's compensated its sales employees on a one hundred percent commission basis. Sales employees only earned

---

[6] We acknowledge the amicus briefs submitted in support of Jordan's by the Pioneer Public Interest Law Center; the Retailers Association of Massachusetts; and the Massachusetts Employment Lawyers Association, Fair Employment Project, Inc., and Public Justice. We also acknowledge the amicus brief submitted in support of the plaintiff class by the Attorney General.

commissions if they made sales. Jordan's utilized a system of draws under its Sales Draw Plan (Draw Plan), which functioned like a loan or advance on the sales employees' future commissions because the draws were deducted, or "pa[id] back," from the sales employees' commissions once earned. Employees received a draw that was at least equal to the minimum hourly wage for all time that they worked in one week, up to forty hours, plus one and one-half times the minimum wage for any time that they worked over forty hours in one week or for any time that they worked on Sundays.

The Draw Plan included three primary types of draws: (1) a base draw, (2) an overtime draw, and (3) a premium draw. Jordan's calculated the base draw by multiplying the number of hours the employee worked during the pay period by a base hourly rate, which was equivalent to the minimum wage rate at the time. The overtime draw was calculated by multiplying the hours an employee worked over forty hours in a given week by the base hourly rate and then applying a 1.5 overtime multiplier. Similarly, the premium draw was calculated by multiplying the hours a sales employee worked on Sunday by the base hourly rate, and then by a 1.5 "premium" multiplier. All three categories of draws were "recoverable from future commissions."

Jordan's only used future commissions to cover an employee's draw if the employee had a "negative draw balance" --

which was created where commissions earned during a pay period were less than the total draw owed for the same period. In those instances, the negative balance of the recoverable draw was carried forward to future weeks "and deducted from future Sales Earnings." Sales earnings included commissions.

b. <u>Hypotheticals</u>. Given the complexity of Jordan's pay scheme, we provide the following hypotheticals for clarity. In these hypotheticals, we will use a base hourly rate of $10 and a 1.5 premium multiplier for time worked on a Sunday.[7]

The over-all effect of Jordan's compensation scheme was that a sales employee's gross pay for a particular week would be an amount equal to his or her total draw if the sales employee's commissions did not exceed the total draw for that week, although this would create a negative draw balance for subsequent weeks if the commissions were less than the total draw. Conversely, in weeks where the sales employee's commissions exceeded his or her total draw, the sales employee's gross pay would be in an amount equal to his or her commissions minus the negative draw balance (if any), but would not be any lower than the amount of the employee's total draw.

---

[7] These hypotheticals only address Sunday premium pay; the overtime draw functioned the same as the Sunday premium draw.

i.   Example no. 1.  If a sales employee worked forty hours in a given week (week no. 1), which included ten hours on a Sunday, the employee's total draw would be $450, comprised of a $300 base draw (30 hours x $10 hourly rate) plus a $150 premium draw (10 hours x $10 hourly rate x 1.5 premium multiplier).  If this employee also earned $400 in commissions in week no. 1, then the employee's gross pay would be $450, with a $50 negative balance ($400 commissions - $450 total draw) carried over to the following week (week no. 2).  We will also assume that the hypothetical sales employee has no negative draw balance going into the first week (week no. 1) of the hypothetical.

If during week no. 2, the sales employee worked thirty hours on days other than Sunday and earned $400 in commissions, the employee's gross pay would be $350 rather than $400 because the $50 negative balance from week no. 1 would be deducted from the employee's commissions.

In total, the sales employee would receive $800 in gross pay over the two weeks ($450 from week no. 1 + $350 from week no. 2).

ii.  Example no. 2.  If the sales employee worked forty hours in week no. 1 on days other than Sunday and earned $400 in commissions, the employee would receive $400 of gross pay.  In this scenario, the employee's commissions would be equal to the total draw and therefore there would not be any negative balance

carried over into week no. 2. We will also assume that the sales employee has no negative draw balance going into the first week (week no. 1) of the hypothetical.

If during week no. 2, the sales employee worked thirty hours on days other than Sunday and earned $400 in commissions, the employee's gross pay for week no. 2 would be $400.

The sales employee would again receive $800 of gross pay over the two week period ($400 from week no. 1 + $400 from week no. 2).

Notably, the sales employee in these two hypotheticals would earn the same gross pay over a two week period regardless of whether the employee worked on Sunday in week no. 1. In short, under Jordan's Draw Plan, the premium Sunday rate has no impact on this sales employee's compensatory bottom line, at least when the employee's gross pay from the two weeks is combined.[8]

c. Procedural history. In 2019, Sutton commenced a putative class action lawsuit against Jordan's on behalf of

---

[8] Although a sales employee's gross pay would increase if the employee earned higher commission while working on Sundays, this fact does not influence our analysis of whether Jordan's complied with the Sunday pay statute, as an employer's obligation to provide Sunday premium pay, pursuant to G. L. c. 136, § 6 (50), is distinct from and in addition to the employer's obligation to pay employees their earned commission. See G. L. c. 149, § 148.

himself and similarly situated sales employees to recover unpaid wages. Sutton alleged in count one and count two of his complaint that Jordan's failed to pay its sales employees overtime and Sunday pay as required by G. L. c. 151, § 1A, and G. L. c. 136, § 6 (50), respectively. Sutton brought these claims under the Wage Act, G. L. c. 149, §§ 148 and 150. A judge later certified the following class of plaintiffs:

> "All individuals whom Jordan's Furniture, Inc. ha[d] employed in the positions of "sales consultant[s]" or "sleep technician[s]" at one or more of its retail stores located in Massachusetts, during the time period between June 19, 2016 and August 1, 2019 and who worked more than forty hours in any workweek or on any Sunday."

The parties then filed cross motions for summary judgment. Jordan's sought summary judgment on all counts. The plaintiff class sought partial summary judgment as to Jordan's liability for failure to comply with the overtime and Sunday pay statutes, reserving the calculation of damages for trial. The motion judge allowed the plaintiff class's motion for partial summary judgment, and accordingly entered summary judgment on the issue of liability in favor of the plaintiff class.[9]

---

[9] In count three of the complaint, Sutton alleged that Jordan's violated G. L. c. 136, § 6 (50), by requiring employees to work on Sundays at a rate of less than one and one-half times the employee's hourly rate. The motion judge entered summary judgment on this count in favor of Jordan's on the ground that it was redundant, but otherwise denied Jordan's motion for summary judgment as to the remaining counts. Neither party has raised the dismissal of count three on appeal.

Thereafter, the parties came to an agreement regarding damages, which included all single and mandatory treble damages and prejudgment interest, both in gross and on a per member basis for all 247 members of the class, but which did not include attorney's fees. The parties filed a joint motion to enter the proposed form of judgment that expressly reserved the parties' right to appeal. The motion was allowed by the judge who had granted the plaintiff class summary judgment.

The plaintiff class then filed a motion before the same judge to amend the judgment and a petition for fees and costs seeking statutory attorney's fees under G. L. c. 149, § 150, and G. L. c. 151, § 1B.[10] Specifically, the plaintiff class sought $1,035,110 in attorney's fees plus $17,181.98 in costs. The judge allowed the motion and petition in part. Adopting the lodestar method, the judge first determined the reasonable hours spent on the case by counsel for the plaintiff class, and discounted the hours spent in settlement negotiations and mediation attempts. The judge then calculated a base lodestar figure of $161,840 and enhanced the award by using a multiplier of four, rather than a multiplier of five as requested by the

---

[10] Pursuant to G. L. c. 149, § 150, an employee who prevails in an action against his or her employer for certain Wage Act violations, including failure to pay "wages earned," G. L. c. 149, § 148, is entitled to the "costs of the litigation and reasonable attorneys' fees."

plaintiff class.[11]  An amended judgment entered awarding the
plaintiff class $647,360 in attorney's fees plus $7,631.98 in
costs, for a total award of $654,991.98.

Because of an inadvertent error in calculating damages, the
parties subsequently filed a motion to amend the judgment again,
which was granted by the same judge.  Jordan's timely appealed
from the Superior Court judge's finding of liability on summary
judgment and from the award of attorney's fees.  The plaintiff
class filed a cross appeal, seeking review only of the judge's
ruling on the fee petition.  Specifically, the plaintiff class
challenges the judge's decision to exclude time spent on
settlement negotiations and mediation attempts from the total
reasonable hours spent on the case.  After the cross appeals
were entered in the Appeals Court, we allowed Jordan's petition
for direct appellate review.

2.  Discussion.  a.  Standard of review.  "We review a
decision on a motion for summary judgment de novo."
Conservation Comm'n of Norton v. Pesa, 488 Mass. 325, 330
(2021).  "Summary judgment is appropriate where there is no
genuine issue of material fact and the moving party is entitled

---

[11] In his endorsement on the plaintiff class's motion to
amend the judgment and petition for fees and costs, the judge
initially stated that he was applying a multiplier of 4.5 to the
lodestar amount.  However, in his final calculation of
attorney's fees, the judge applied a multiplier of four.

to judgment as a matter of law." Id. When both parties move for summary judgment, as the parties did here, "we view the evidence in the light most favorable to the party against whom summary judgment was entered." Id. See Miramar Park Ass'n v. Dennis, 480 Mass. 366, 377 (2018).

b. Relevant statutes. We start our analysis with an examination of the statutory language of the overtime and Sunday pay statutes in effect at the relevant time. The overtime statute, G. L. c. 151, § 1A, mandates that "employee[s] receive[] compensation for [their] employment in excess of forty hours at a rate not less than one and one half times [their] regular rate." The Sunday pay statute, G. L. c. 136, § 6 (50), as amended through St. 2014, c. 182, required that employers "compensate all employees engaged in . . . work performed on Sunday[s] . . . at a rate not less than one and one-half times the employee's regular rate."[12]

As mentioned at the outset of this opinion, we previously examined the application of the overtime and Sunday pay statutes

---

[12] The Sunday pay statute, G. L. c. 136, § 6 (50), was amended, effective January 1, 2019, decreasing the compensation rate to 1.4 times the employee's regular rate. St. 2018, c. 121, §§ 5, 37. The parties accounted for this rate change when determining damages. General Laws c. 136, § 6 (50), was then legislatively abolished, effective January 1, 2023. St. 2018, c. 121, §§ 9, 36. Given that the events at issue in this case occurred between 2016 and 2019, the Sunday pay statute was in effect for the relevant time period.

to one hundred percent commission employees in Sleepy's, 482 Mass. at 228, which we summarize here. In Sleepy's, the plaintiffs were sales employees who were "paid on a '[one hundred percent] commission' basis: their wages took the form of a recoverable draw of $125 per day, and any sales commissions in excess of the draw." Id. at 229. Their total compensation "always equaled or exceeded the minimum wage times the number of hours they worked up to forty hours, plus one and one-half times the number of hours they worked over forty hours or on Sunday." Id. Even so, we concluded that these employees were entitled to "separate and additional" payments for overtime and Sunday hours and that "employers may not retroactively reallocate and credit payments made to fulfill one set of wage obligations against separate and independent obligations." Id. at 228-229, 233, 239-240. We reasoned that this outcome was necessary to fulfill the three purposes of the overtime and Sunday pay statutes, which are "[1] to reduce the number of hours of work, [2] encourage the employment of more persons, and [3] compensate employees for the burden of a long workweek" (citation omitted). Id. at 233-234, 239.

    c. Compliance with overtime and Sunday pay requirements. Although Jordan's Draw Plan is different in some respects from the compensation scheme in Sleepy's, it suffers from the same fundamental flaws as the scheme in Sleepy's -- namely, once the

layers of complexity have been peeled back, it is clear that Jordan's plan fails to provide employees with "separate and additional" payments for overtime and Sunday hours.  Sleepy's, 482 Mass. at 228.[13]

Jordan's "tracked all regular, overtime, and Sunday hours, exactly calculated the regular and premium pay for those hours, and paid that amount to each sales employee."  Although these payments then appeared as separate line items on a sales employee's pay stub, they in fact were not separate from and in addition to the sales employee's commissions, because, as explained supra, negative draw balances were deducted from the employee's future commissions; thus, the draw payments that an employee received did not have an impact on the employee's gross pay over a broader time frame.  In our Sunday premium hypothetical above, while the sales employee would receive a higher gross pay in week no. 1 if he or she worked on a Sunday, the employee would nonetheless receive the same total compensation over a two week period as if the employee had not

---

[13] Jordan's also emphasizes that under its compensation scheme an employee would never be paid less than minimum wage plus all statutory premium pay.  This argument fails.  In Sleepy's, 482 Mass. at 236, we noted that the mere fact that "the payments that the employees received always equaled or exceeded one and one-half times the minimum wage for all overtime hours worked [and all hours worked on Sundays]" did not alter our analysis.  This fact is likewise immaterial here.

worked on a Sunday during week no. 1, because the employee's commissions in week no. 2 would be reduced to offset the Sunday premium pay from week no. 1.[14]

In this way, Jordan's Draw Plan is similar to the compensation scheme used by the defendant employer in Mullally v. Waste Mgt. of Mass., Inc., 452 Mass. 526, 529-530 (2008). In Mullally, the "employer used a payroll formula founded on a fluctuating 'base pay rate' that reflected the number of overtime hours an employee actually worked." Sleepy's, 482 Mass. at 234, citing Mullally, supra at 529. "Nonetheless, the employee would receive 'approximately the same hourly wage regardless [of] whether [he or she] work[ed] overtime.'" Sleepy's, supra, quoting Mullally, supra at 532. In Mullally, supra, we concluded that the employer's payroll formula violated the overtime statute because it "evade[ed] the economic disincentive to have an employee work more than forty hours a week." Likewise, Jordan's compensation scheme also evades the purpose of the overtime and Sunday pay statutes because it does not incentivize Jordan's to have its sales employees work shorter weeks.

---

[14] In its briefing, Jordan's presents a hypothetical of its own to show that it provided higher compensation for overtime work. It suffices to say that Jordan's ignores in its hypothetical that a negative balance would be carried over to the next week, thereby negating any higher compensation.

Jordan's contends that its compensation scheme was lawful because it never retroactively allocated commissions to overtime and Sunday pay, unlike the defendant employer in Sleepy's.  But, regardless of whether the allocation is retroactive, it is a violation of the Wage Act to "[]allocate and credit payments made to fulfill one set of wage obligations against separate and independent obligations."  Sleepy's, 482 Mass. at 233.  The commissions owed to Jordan's sales employees were intended to fulfill wage obligations separate from the overtime and Sunday pay requirements, and thus it was impermissible for Jordan's to make deductions from its employees' commissions to cover its overtime and Sunday pay obligations.

Simply put, a sales employee's commissions are one type of compensation, and overtime and Sunday pay are separate types of compensation that require employers to make additional payments to employees.  By attempting to allocate amounts owed to its sales employees in commissions toward their overtime and Sunday premium draws, Jordan's did not provide its sales employees with separate and additional overtime and Sunday pay, thereby violating the overtime and Sunday pay statutes.[15]

---

[15] Jordan's contends that it "merely applied the formula it had chosen for calculating the amount of an employee's commission[s]."  It is true that the Wage Act does not provide a specific means for calculating commissions.  See G. L. c. 149, § 148.  However, an employer's formula cannot violate the Wage Act or be used to circumvent other obligations under the Wage

Jordan's alleges that two opinion letters from the former division of occupational safety (division), bearing the same language as the letters sent to the defendant employer in Sleepy's, and one opinion letter from the Attorney General's office indicate that its pay plan complied with the overtime and Sunday pay statutes.[16]  See Sleepy's, 482 Mass. at 232 nn.13, 14. However, "[a]n opinion letter interpreting a statute or

_____

Act.  See id. ("No person shall by a special contract with an employee or by any other means exempt himself from this section or from [§ 150]").

[16] With respect to the first letter from the division, Jordan's sought guidance from the division in 2003 as to whether "inside sales employee[s]" could be paid on a one hundred percent commission basis and, if so, whether such employees were owed overtime and Sunday pay, what form these payments could take, and how they should be calculated.  The division sent Jordan's an opinion letter in March 2003, which advised that inside sales employees can be paid on a one hundred percent commission basis, but that such employees are still owed overtime and may be owed Sunday pay.  The Attorney General's office also responded to Jordan's 2003 request for guidance with a letter, which expressly announced that "the following response is for informational purposes only and should not be construed as a legal opinion of the Attorney General."  More to the point, although the letter stated that inside sales employees can be paid on a one hundred percent commission basis, it did not address Jordan's questions relating to overtime and Sunday pay.

Lastly, Jordan's sought guidance from the division again in 2009 as to how an employee's overtime should be calculated if the employee occasionally "works random shift(s) . . . in a different role in which the employee earns a base hourly rate plus a commission."  In December 2009, the division sent Jordan's an opinion letter, which advised that "inside salespersons are subject to the state overtime law" and that an "employee's regular hourly rate must not be less than the minimum wage."

regulation 'does not have the binding force attributable to a full-blown regulation.'" Id. at n.11, quoting Massachusetts Gen. Hosp. v. Rate Setting Comm'n, 371 Mass. 705, 707 (1977). Additionally, no deference is given to an agency's interpretation of a statute if it is "contrary to plain language of the statute and its underlying purpose." Sleepy's, supra, quoting Swift v. AutoZone, Inc., 441 Mass. 443, 450 (2004). Therefore, to the extent that these nonbinding letters could be interpreted contrary to the rule announced in Sleepy's, they did not have the force of law.

d. Retroactive application of Sleepy's. Jordan's argues that the motion judge erred in applying our decision in Sleepy's retroactively. We disagree. "Where a decision does not announce new common-law rules or rights but rather construes a statute, no analysis of retroactive or prospective effect is required because at issue is the meaning of the statute since its enactment." McIntire, petitioner, 458 Mass. 257, 261 (2010), cert. denied, 563 U.S. 1012 (2011). In Sleepy's, we interpreted how the overtime and Sunday pay statutes apply to an employer's compensation scheme for one hundred percent commission employees. Sleepy's, 482 Mass. at 228-229. We therefore determined the meaning of these statutes "since [their] enactment." McIntire, petitioner, supra. Accordingly,

the judge properly applied our holding in Sleepy's to this case. See Sleepy's, supra.

e. Private right of action. There is no express private right of action in the Sunday pay statute, G. L. c. 136, § 6 (50), and the Sunday pay statute is not included in the list of statutory provisions that can be enforced under the Wage Act's private right of action, G. L. c. 149, § 150. Nonetheless, we conclude that the Sunday pay statute can be enforced under the Wage Act's private right of action through G. L. c. 149, § 148.

Under the Wage Act:

"An employee claiming to be aggrieved by a violation of [§] 33E, 52E, 148, 148A, 148B, 148C, 150C, 152, 152A, 159C or 190 or [G. L. c. 151, § 19,] may . . . institute and prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action for injunctive relief, for any damages incurred, and for any lost wages and other benefits."

G. L. c. 149, § 150. Included in the enumerated list of privately enforceable sections is § 148, which requires employers to timely pay their employees "wages earned." Section 148 states that "[e]very person having employees in his service shall pay weekly or biweekly each such employee the wages earned by him." G. L. c. 149, § 148. "When an employee has completed the labor, service, or performance required of him . . . he has 'earned' his wage" (quotation and citations omitted). Fernandes v. Attleboro Hous. Auth., 470 Mass. 117, 124 n.6 (2014).

Section 148 applies to all wages earned, including those prescribed by statute.  See Drive-O-Rama, Inc. v. Attorney Gen., 63 Mass. App. Ct. 769, 769-770 (2005) (failure to pay time and one-half for work on legal holidays, as required by G. L. c. 136, § 13, violated Wage Act).  When an employee works on a Sunday, he or she earns Sunday pay pursuant to G. L. c. 149, § 148; therefore, a Sunday pay violation is also a violation of § 148 of the Wage Act.  In turn, an employee can bring an action to recover for Sunday pay violations under the Wage Act's private right of action.[17]

Our decisions in Devaney v. Zucchini Gold, LLC, 489 Mass. 514 (2022); Donis v. American Waste Servs., LLC, 485 Mass. 257 (2020); and Salvas v. Wal-Mart Stores, Inc., 452 Mass. 337 (2008), do not foreclose this conclusion.  In Devaney, supra at 515, 518-519, we held that the Wage Act's private right of action cannot be used to pursue a claim for failure to pay overtime arising solely under the Federal Fair Labor Standards

---

[17] Jordan's also argues that the purposes of the Sunday pay statute and the Wage Act, as evidenced through their respective legislative histories, indicate that the Sunday pay statute cannot be enforced under the Wage Act.  However, since the plain language of the Sunday pay statute and the Wage Act are clear and unambiguous as to whether Sunday pay constitutes "wages earned," we need not reach their legislative histories.  See Ciani v. MacGrath, 481 Mass. 174, 178 (2019) ("Ordinarily, where the language of a statute is plain and unambiguous, it is conclusive as to legislative intent" [citation omitted]).

Act (FLSA), 29 U.S.C. §§ 201 et seq., because the "FLSA's comprehensive remedial scheme" preempts the Wage Act. Here, preemption is not an issue because the Sunday pay statute is a State law and it does not contain its own remedial scheme. See Devaney, supra at 522.

In Donis, 485 Mass. at 265, we held that, since the Prevailing Wage Act, G. L. c. 149, §§ 26-27H, has its own private right of action, an employee could not recover for a violation of this act under the Wage Act's private right of action, because this "would . . . render the private right of action created by the Prevailing Wage Act utterly unnecessary, thereby violating the canon of statutory construction against superfluity." Given that the Sunday pay statute does not contain its own private right of action, there is no risk of "superfluity" here. Donis, supra. Notably in Donis, we also said that:

> "[h]ad the Legislature intended for violations of the Prevailing Wage Act to be remedied under the Wage Act, . . . the Legislature simply could have omitted a private cause of action from the Prevailing Wage Act, thus implying that aggrieved employees would have to look elsewhere for a remedy, including under the Wage Act."

Id. Here, unlike in Donis, the Legislature "omitted a private cause of action" under G. L. c. 136, § 6 (50), "thus implying" that employees can look to the private right of action under the

Wage Act to remedy violations of the Sunday pay statute.  Donis, supra.

Lastly, in Salvas, 452 Mass. at 372-373, we held that the Wage Act's private right of action cannot be used to enforce mandatory unpaid meal breaks, pursuant to G. L. c. 149, § 100, because this provision was not included in the enumerated list of provisions under G. L. c. 149, § 150.  Our decision in Salvas does not foreclose the Wage Act's private right of action from being used to enforce the Sunday pay statute because a Sunday pay violation also constitutes a violation of § 148, which is included in the enumerated list.  By contrast, the issue in Salvas, supra at 374-375, concerned whether the employer properly provided its employees with unpaid meal breaks, a benefit that may possess monetary value under a breach of contract claim despite not constituting actual wages.

f.  Attorney's fees.  The plaintiff class was entitled to an award of attorney's fees pursuant to G. L. c. 149, § 150, because it prevailed at summary judgment in this matter.  The Superior Court calculated the attorney's fees owed to the plaintiff class using the lodestar method, and then enhanced the award by applying a four times multiplier.  See note 11, supra. Jordan's argues that the judge abused his discretion in applying the four times multiplier.  The plaintiff class also challenges the judge's calculation of attorney's fees, but on the grounds

that the judge erred in discounting the time that counsel for the plaintiff class spent in settlement negotiations.[18]

We review a judge's award of attorney's fees for an abuse of discretion.  See LaChance v. Commissioner of Correction, 475 Mass. 757, 772 (2016).  "The amount of a reasonable attorney's fee, awarded on the basis of statutory authority[] . . . is largely discretionary with the judge, who is in the best position to determine how much time was reasonably spent on a case, and the fair value of the attorney's services."  Fontaine v. Ebtec Corp., 415 Mass. 309, 324 (1993).  However, a judge's discretion in calibrating such an award is not limitless.  "We find abuse of discretion when we determine that a decision resulted from a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives" (quotation and

_____

[18] The plaintiff class also requests reasonable attorney's fees and costs incurred in connection with this appeal.  The plaintiff class is statutorily entitled to appellate attorney's fees and costs, pursuant to G. L. c. 149, § 150, insofar as the plaintiff class has prevailed on the issues raised on appeal by Jordan's.  See Reuter v. Methuen, 489 Mass. 465, 476 n.8 (2022).  Accordingly, the plaintiff class may, within fourteen days of the date of the rescript, file with the clerk of the court for the Commonwealth an application for fees and costs, together with any supporting material.  See Fabre v. Walton, 441 Mass. 9, 10-11 (2004).  Thereafter, Jordan's shall have fourteen days within which to respond to the plaintiff class's application.

citation omitted).  Commonwealth v. Jackson, 486 Mass. 763, 768 (2021).

i.  Lodestar multiplier.  The lodestar method is generally used for calculating attorney's fees under fee-shifting statutes.  See LaChance, 475 Mass. at 772; Fontaine, 415 Mass. at 325.  See also Reuter v. Methuen, 489 Mass. 465, 468 (2022) (lodestar method used in Wage Act case).  The lodestar method is "calculated by multiplying the number of hours reasonably spent on the case [by] a reasonable hourly rate."  Fontaine, supra at 324.  "The judge may then adjust the lodestar calculation upward or downward in light of the results obtained."  LaChance, supra. "In limited circumstances, statutory fee awards may [also] be enhanced to compensate for the risk of nonpayment."  Fontaine, supra.

Here, the motion judge calculated the attorney's fees by first determining what a reasonable hourly rate would be, using as a point of reference the "average rate in the community for similar work by attorneys with the same years' experience." Killeen v. Westban Hotel Venture, LP, 69 Mass. App. Ct. 784, 791 (2007).  The judge found that the actual hourly rates submitted by the plaintiff class were "within the range of acceptable fees" and thus utilized those hourly rates.  The judge then reviewed the hourly billing statements submitted by counsel for

the plaintiff class and discounted hours spent toward "mediation/settlement undertakings."

After determining the base lodestar amount, the judge then considered the propriety of a multiplier. Although the plaintiff class sought a multiplier of five, the judge concluded that, despite the "complexity and nuances related to [the] defendant's compensation methods," a multiplier of four was more appropriate because the parties agreed to the amount of the judgment "after dispositive motions were decided unlike those [cases] identified by [the] plaintiff[ class] in [its] brief." In doing so, the judge stated that he relied on certain unspecified "factors"[19] and "follow[ed] the precedent identified in cases cited by [the] plaintiff[ class] where multipliers ranging up to 'four are frequently awarded in common fund cases where the loadstar method is applied.'" See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 341 (3d Cir. 1998), cert. denied, 525 U.S. 1114 (1999). We conclude that the judge abused his discretion by relying exclusively on common fund cases -- which involve policy

---

[19] The judge did not delineate the factors he referenced in his decision, but it is our understanding that these factors may have been listed in a footnote in a memorandum of law submitted by the plaintiff class in support of the petition for attorney's fees and costs. This memorandum was not included in the record.

considerations different from fee-shifting cases such as this one -- in calculating the award of attorney's fees.

Common fund cases are those in which "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole" (citation omitted). In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 305 (1st Cir. 1995). Thus, "the key distinction between common-fund and fee-shifting cases is whether the attorney's fees are paid by the client (as in common-fund cases) or by the other party (as in fee-shifting cases)." In re The Home Depot Inc., 931 F.3d 1065, 1079 (11th Cir. 2019).

For the calculation of attorney's fees, while "the lodestar method is entrenched in the statutory fee-shifting context," the "percentage of the fund" (POF) method is utilized in common fund cases, whereby "the court shapes the counsel fee based on what it determines is a reasonable percentage of the fund recovered for those benefitted by the litigation." In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d at 305. After calculating attorney's fees via the POF method in common fund cases, courts generally also conduct a lodestar analysis and use the resulting lodestar value as a "cross-check" to determine if the attorney's fees are

reasonable. In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 742 (3d Cir.), cert. denied, 534 U.S. 889 (2001). "[L]odestar cross-check calculation need not entail mathematical precision or bean-counting, and is not a full-blown lodestar inquiry" (quotations and citations omitted). In re AT & T Corp., 455 F.3d 160, 169 n.6 (3d Cir. 2006).

Much ink has been spilled on the different purposes undergirding an award of attorney's fees in common fund cases and statutory fee-shifting cases. See, e.g., Skelton v. General Motors Corp., 860 F.2d 250, 252 (7th Cir. 1988), cert. denied, 493 U.S. 810 (1989) ("Because there is a difference between statutory fee-shifting cases and common fund cases with respect, inter alia, to who bears the direct burden of compensating plaintiffs' attorneys, different policies may govern the two types of cases"). Among these differences, an award of attorney's fees in common fund cases is in part intended to prevent the unjust enrichment of class members who benefited from but did not contribute to the costs of the lawsuit, whereas the purposes of fee-shifting statutes, like the Wage Act, are to disincentivize unlawful conduct and incentivize attorneys "to provide representation in cases that otherwise would not be financially prudent for them." Ferman v. Sturgis Cleaners, Inc., 481 Mass. 488, 492-493 (2019). Given these differences, caution should be exercised in statutory fee-shifting cases to

ensure that excessive multipliers do not "inequitably burden defendants." Skelton, supra at 253.

Further, a fee-shifting statute "creates an exception to the 'American rule' that the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser" (quotation and citation omitted). Brundle v. Wilmington Trust, N.A., 919 F.3d 763, 786 (4th Cir. 2019). "In contrast, the common fund doctrine -- though often similarly described as an exception -- better accords with the American rule by holding the beneficiaries of a judgment or settlement responsible for compensating the counsel who obtained the judgment or settlement for them." Id. Accordingly, awards made pursuant to fee-shifting statutes should generally utilize "more conservative" principles than those made pursuant to the common fund doctrine. Sack v. Sack, 328 Mass. 600, 605 (1952). For this reason, in determining lodestar multipliers, we strongly caution judges against relying exclusively on common fund case law in a fee-shifting case such as this one.

Here, because the motion judge neither explicitly identified all the factors that he considered nor provided an explanation of the weight that he assigned to each factor, our appellate review is significantly impeded. See Hensley v. Eckerhart, 461 U.S. 424, 437 (1983) (important for judges to "provide a concise but clear explanation of [their] reasons for

the fee award").  Still, a four times multiplier may have been excessive in this case given the judge's exclusive reliance on common fund cases, which do not utilize the more conservative approach that is required in fee-shifting cases.[20]

We vacate the award of attorney's fees and remand the matter to the Superior Court for recalculation of the award.  On remand, if the judge seeks to enhance the base lodestar figure by a multiplier, he must set forth expressly the factors that he relies on and the weight he ascribes to those factors, without reliance solely on common fund cases where the lodestar figure was used as a cross check.

ii.  Time spent on mediation and settlement negotiations. We now turn to the plaintiff class's argument that the judge erred in excluding hours spent in "mediation/settlement undertakings," which were unsuccessful, when making the lodestar calculation.  In support, the plaintiff cites Pérez-Sosa v. Garland, 22 F.4th 312, 323 (1st Cir. 2022), where the United

---

[20] Indeed, significantly lower multipliers have been applied in fee-shifting cases even where the facts arguably were more favorable.  For example, in Ridgeway v. Wal-Mart Stores Inc., 269 F. Supp. 3d 975, 996-999 (N.D. Cal. 2017), the court applied a two times lodestar multiplier in a wage case brought under a fee-shifting statute where, among other considerations, the plaintiffs' counsel spent $1.7 million in out of pocket expenses on the case, the plaintiffs risked an unfavorable jury verdict but counsel secured a $60.8 million judgment after trial, and the defendant "vigorously defended" the case by raising "numerous novel, difficult, and complex issues" over the course of nearly nine years.

States Court of Appeals for the First Circuit held that it was error to "categorically exclud[e] time spent on settlement negotiations from the lodestar calculation."  In rejecting the "[s]peculative" notion that including such time in the lodestar calculation could frustrate settlement, the court reasoned:

> "We think it is unrealistic to assume that the marginal cost of counsel's work on settlement will scare off defendants in a substantial number of cases.  Litigants settle cases because doing so is cheaper and less risky than fighting tooth and nail to the bitter end.  The extra expense of compensating time reasonably spent in settlement negotiations scarcely alters this calculus.  Nor will attorneys be tempted to drag out talks unnecessarily because the court will later trim away time wasted as unreasonably expended."

Id.  Thus, the court concluded that "time reasonably spent in pursuit of settlement is worthwhile and, therefore, generally fit for inclusion in a fee award."  Id.

We find this reasoning to be persuasive and therefore conclude the same.  When calculating an award of attorney's fees pursuant to the lodestar method, a judge cannot categorically discount all time spent in the pursuit of a possible settlement.  Instead, a judge must determine whether -- and if so, to what extent -- that time was "reasonably spent" in pursuit of settlement.  Fontaine, 415 Mass. at 324.  The mere fact that a case did not ultimately settle does not render time spent toward such a pursuit unreasonable.

Accordingly, we conclude that the motion judge erred by categorically excluding time spent on settlement negotiations and mediation from the calculation of the base lodestar figure. On remand, to the extent that the judge discounts any such time, he must provide a clear explanation as to why it was spent unreasonably.  See Hensley, 461 U.S. at 437.

3.  Conclusion.  So much of the second amended judgment as awarded attorney's fees is vacated, and the matter is remanded to the Superior Court for further proceedings to recalculate the award of attorney's fees in accordance with this opinion.[21]  In all other respects, the second amended judgment is affirmed.

So ordered.

---

[21] We also conclude that the plaintiff class is entitled to reasonable appellate attorney's fees.  See note 18, supra.